# Shimer *v.* Penn Electric Smelting Corporation, Appellant.

*Contract—Damages—Charge—Insufficiency of charge as to damages.*

1. In actions on contracts as well as in actions of trespass, if an instruction is clearly erroneous, it is ground for reversal.

2. The jury should have such guidance from the court on the question of damages as will give them an intelligent understanding of how they should be ascertained.

3. Where in an action on a written contract the statement of claim sets forth a stated amount as damages, and subsequently the statement is amended so as to aver a change in the original contract by parol, and the damages claimed are identical, but the evidence shows a different amount, and it appears that the accounts are complicated, and that certain claims under the changed situation are not apparent, the court commits reversible error if it does not fully and adequately instruct the jury on the subject of damages.

Argued February 21, 1922.    Appeal, No. 33, Jan. T., 1922, by defendants, from judgment of C. P. No. 1, Phila. Co., Dec. T., 1919, No. 20, on verdict for plaintiff, in case of Herbert M. Shimer v. Penn Electric Smelting Corporation, defendant, and Midvale Steel & Ordnance Co., garnishee. Before FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Foreign attachment on contract. Before SHOE-
MAKER, J.

The opinion of the Supreme Court states the facts.

The letter referred to in the opinion is as follows:

"165 Broadway, New York, April 3, 1919.
"Mr. H. M. Shimer,

"c/o Penn Electric Smelting Corp.,

"19th. St. & Washington Ave., Philadelphia, Pa.
"Dear Sir:

"Confirming our conversation and verbal agreement
of to-day regarding the present status of our company
and the procedure to be followed in order to best meet
our financial obligations and to convert our unfinished
and finished material to a commercial quality, it is
mutually agreed that you are to direct and assist Mr.
Benner in packing all of the material, the semi-finished
and finished material now located in the plant at Phila-
delphia and ship same at the earliest possible moment to
Metal Alloys, Inc., c/o Ludlum Steel Company, Water-
vliet, N. Y., with whom we will make arrangements to do
the necessary refining in order to put this material in
shape so that we can dispose of it.

"It is understood that the grinding equipment, the
Wilfley Table and such other equipment as will be of
service to Metal Alloys, Inc., in reworking the above prod-
uct will also be forwarded to them as soon as possible.

"As we advised you this morning, we feel obliged to
continue the payment to you of the monthly rent, $250.00,
but we shall gladly take advantage of your kind offer to
endeavor to lease the plant to other parties, or utilize it
yourself in other work, which will result in your releas-
ing us from the monthly rental payments.

"We also appreciate and accept your offer of discon-
tinuing your monthly drawing account.

"Yours very truly,

"PENN ELECTRIC SMELTING CORPORATION,
"HGB/AFA            By [Sgd.] H. G. Batcheller.
"Accepted: H. M. Shimer."

Verdict and judgment for plaintiff for $16,170. Defendant appealed.

*Error assigned* was, inter alia, (17) instructions recited in the opinion of the Superior Court, quoting them.

*Lewis Lawrence Smith,* with him *George V. Strong,* for appellant.

*Harold B. Beitler,* with him *Roland C. Heisler,* for appellee.

OPINION BY MR. JUSTICE SCHAFFER, March 20, 1922:

On September 12, 1918, plaintiff, Herbert M. Shimer, Shimer & Company, Incorporated, and Clements Batcheller entered into a written contract, in which it was recited that plaintiff was the owner and entitled to the possession of a factory property at 19th Street and Washington Avenue, in the City of Philadelphia, where he had conducted the business of smelting and refining metals; that Shimer & Company, Incorporated, was the owner of certain machinery in the building; and that Batcheller was acting as the representative of a corporation to be formed, to which the rights and privileges under the agreement were to be transferred and assigned. These rights and privileges were, as a matter of fact, subsequently assigned to the defendant, the Penn Electric Smelting Corporation, which was the concern in contemplation at the time of the contract, and all the rights of Shimer & Company, Incorporated, were assigned to plaintiff.

By the agreement, plaintiff covenanted to lease the real estate and machinery to Bacheller and his assigns. The lease was to run until the 7th of December, 1919, with the privilege of a renewal thereafter for a term of three years. The rental to be paid for the property was $3,000 per annum, payable monthly. Bacheller agreed

for himself and his assigns to employ Shimer in the conduct of the business to be carried on in the plant, which was the electrical smelting and refining of metals from ores. As compensation for his services, Shimer was to receive one-third of the net profits of the business. The contract provided that he should be allowed a drawing account of $500 per month, payments thereof to apply on his total compensation. Plaintiff guaranteed that he would produce a certain quantity of ferro tungsten per day, provided the necessary raw materials in sufficient quantity and suitable quality were furnished, that the amount of tungsten which would be produced by him should be not less than a certain percentage of tungsten contained in the ore treated or refined and that the product should be of commercial and marketable quality. By the express terms of the contract, Batcheller reserved to himself and his assigns the right to terminate it at the end of any month. In the event of such termination, it was stipulated Batcheller and his assigns should not be liable to Shimer otherwise than for his share of the net profits of the business during the time when it was actually conducted. The contract contained this clause, "the net profits under this agreement, before allowance for taxes, shall be deemed to be the difference between the net revenue from sales made and the cost of materials entering into such product, both at current market prices, plus $0.35 per pound of finished product, which is to cover all direct and indirect expense." Operations were conducted under this agreement until sometime in March, 1919, when it was demonstrated that they were being carried on at a large loss.

On April 3, 1919, plaintiff visited Batcheller in New York, where he claims a new verbal contract was entered into between him and Batcheller, acting for defendant, the effect of which was to modify the contract of September 12th, and to substitute for certain of its provisions the verbal contract, by which it was agreed that, in con-

sideration of plaintiff giving up his right to draw $500 per month under the written contract, he should receive one-third of the profits which the defendant might make out of a contract it had to supply tungsten to the Midvale Steel and Ordnance Company. It was denied on the part of defendant that any such verbal contract was made, and alleged by it that the understanding then arrived at was embodied in a letter, dated April 3, 1919, which appears in the Reporter's notes, and which was assented to by Shimer, as evidenced by the fact that he signed it under the word "Accepted." The purpose and result of this letter, defendant contends, was to terminate the contract of September 12th, and its relations with Shimer, except that defendant was to continue to pay the rent of the property, until another tenant should be obtained, or until Shimer was able to utilize the property himself. The trial court submitted to the jury the question whether the verbal agreement was entered into, and, by their verdict for plaintiff, the jury found that it was.

In his statement of claim, plaintiff first declared on the contract of September 12th, and that, in pursuance of that agreement, profits had been realized to the amount of $54,000, of which he was entitled to receive from the defendant $18,000 less $3,000 which had been paid him on the monthly drawing account. In the first statement of claim, no mention was made of the verbal contract. Subsequently, an amended statement was filed, in which it was set up, that plaintiff, and Batcheller acting for the defendant, had verbally agreed to modify the contract of September 12th in the following particulars: (a) that defendant should purchase in the open market sufficient tungsten metal to complete the performance of the contract then existing and uncompleted, between it and Midvale Steel & Ordnance Company, instead of refining and smelting the ore at the leased premises; (b) that plaintiff should waive and release his right to the draw-

ing account of $500 per month; (c) that the profits in which plaintiff was entitled to share should include all profits made by defendant on the contract between defendant and Midvale Steel & Ordnance Company. The amended statement averred that the profits on this contract amounted to $54,000 and that plaintiff's share of it was $18,000, less the $3,000 which he had received.

As the question whether there was such a verbal contract as contended for by plaintiff is one of fact, which the jury has determined in his favor, that branch of the controversy is closed so far as we are concerned; but the further question, as to what plaintiff is entitled to recover under the contract, is one not free from difficulty, and a careful reading of the record convinces us it was submitted by the trial judge to the jury in a way that did not clearly put before them all the vital factors which should have been used in coming to the amount of their verdict. The record is not in the most satisfactory shape for a review of this question, but, as it appears to us, from our study of it, the amount of the verdict, which is the total of the plaintiff's claim, with interest, is not a just determination of the amount due under the proofs.

In plaintiff's first statement of claim, it was set up that the profits under the original contract amounted to $54,-000, and, in the amended statement, it was alleged that precisely the same profit was realized under the verbal contract. To establish what the profit was, plaintiff called the treasurer of the defendant as under cross-examination, who, testifying from entries in defendant's books of account, which he personally did not keep, produced figures showing the total amount of the sales made to the Midvale Company, and the total cost of the materials to defendant, and then, making an allowance of 35 cents per pound, the overhead charge fixed in the original contract, a result was obtained which indicated a profit approximating $54,000. This same witness later in the

case and after he had opportunity to make a more complete examination of the accounts, testified that the profits amounted to but $29,034.21. This later testimony was not contradicted by anything which plaintiff produced, and to our minds is the only satisfactory evidence in the case as to what the profits were. In view of the complicated state of the accounts, and the difficulty that was inherent in picking out one contract and establishing profits made upon it, the court should have most carefully explained to the jury what this last testimony showed and its evidential value as contrasted with the first testimony given by the witness before he had been able to fully study the accounts, in order that the jury might give to it the weight to which it was undoubtedly entitled; this the court did not do and made but a passing reference to it. Furthermore, plaintiff's claim under the verbal contract was attempted to be established by showing the difference between the sum received from the Midvale Company and the cost of the materials to defendant, plus the item of 35 cents per pound provided in the written contract "to cover all direct and indirect expense." The pertinence of this figure to the new situation created by the verbal contract is not clearly apparent. This sum was to cover expenses connected with the manufacture of the material under the written contract, but whether it was sufficient to cover expenses under the modified contract did not appear. The trial judge recognized that this figure of 35 cents per pound to cover expenses was not a satisfying one because in his charge he says, "there must have been carrying charges for clerical hire, freight and so forth, which would reduce that profit. The only explanation for that would be that the thirty-five cents per pound would be sufficient to cover the carrying charges which were incurred in the purchase and sale of this tungsten." The difficulty, however with this assumption is that there was no convincing evidence to show that 35 cents per pound would cover the expenses;

on the contrary, the treasurer's testimony indicated it would not.

Where the action is trespass to recover damages for personal injuries, we have laid down the rule, "If an instruction is clearly erroneous upon the question of damages it is ground for reversal": Burns v. Penna. R. R. Co., 239 Pa. 207; Reitler v. Penna. R. R. Co., 238 Pa. 1; Wilkinson v. North East Borough, 215 Pa. 486; and in Pauza v. Lehigh Valley Coal Co., 231 Pa. 577, we said, the jury should have such guidance from the court on the question of damages as will give them an intelligent understanding of how they should be ascertained. We think the same rule applicable here. This case is peculiarly one in which the jury should have explicit guidance from the court as to how they should measure the amount to which plaintiff is entitled; this they did not have.

The seventeenth assignment of error is sustained, the judgment is reversed and a new venire awarded.